UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIC AVILA, individually and on behalf of all others similarly situated,<br><br>        **Plaintiff**<br><br>v.<br><br>DRAFTKINGS, INC. and<br>DK PLAYER RESERVE LLC,<br><br>        **Defendants** | CASE NO. |

**CLASS ACTION COMPLAINT**

Plaintiff Eric Avila ("Plaintiff" or "Avila") brings this action on his own behalf and on behalf of putative classes (the "Class" or "Classes") consisting of Plaintiff and all others similarly situated, pursuant to the laws of the United States and Texas, against DraftKings, Inc. ("DraftKings"), and DK Player Reserve LLC (collectively with DraftKings, "Defendants"), and alleges the following:

**INTRODUCTION**

1. It is said that the only way to make money from a casino is to own one. Indeed, sometimes called the world's second oldest profession, gambling is an age-old human vice, and owning a properly run casino is one of the few "sure bets" in today's complex and ever-changing world.

2. Due to more permissive state laws and the omnipresence of smartphones, virtual casinos have risen in popularity over the last fifteen years, and DraftKings is one of the biggest beneficiaries of this trend. With a few clicks on one's smartphone, millions of users can place bets on the DraftKings platform.

3. To place bets, users will keep sums of money in their DraftKings accounts, from

1

which DraftKings will facilitate payouts from losers to winners and take its own cut. Users' account balances can range from a few dollars to hundreds or even many thousands of dollars.

4. This requires trust between users and DraftKings, as DraftKings acts essentially as the fiduciary for vast amounts of user funds.

5. This lawsuit concerns DraftKings' violation of that trust. What happens is DraftKings will lock users out of their accounts, citing undisclosed violation of its terms of service. Hiding behind unspecified "compliance" requirements, DraftKings then denies those individuals the opportunity to withdraw their balances, telling users they cannot withdraw the funds because their accounts are closed. This results in a catch-22 for affected users: Users cannot withdraw funds from their DraftKings account because DraftKings has decided the users do not have a DraftKings account.

6. On information and belief, this practice by DraftKings has resulted in DraftKings' retaining millions of dollars properly belonging to users. DraftKings' conduct constitutes breaches of contract, unjust enrichment, and violations of state consumer protection laws. Moreover, DraftKings' conduct is fraudulent, plain and simple. DraftKings' conduct is actionable under the laws of all states where DraftKings does business.

7. Plaintiff brings this action on his own behalf, and on behalf of a Class consisting of Plaintiff and all others similarly situated, to redress Defendants' deceptive acts and unconscionable business practices.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of

interest and costs, and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' principal place of business is in this District; Defendants conduct business in this District; and Defendants have intentionally availed themselves of the laws and markets of this District. Moreover, the contract entered into by Plaintiff and DraftKings contains a mandatory forum selection clause in Suffolk County, Massachusetts, making venue proper here.

10. Defendants' improper conduct set forth herein occurred in this District or was conceived of and executed from this District in whole or in part. Defendants' decisions to engage in the improper conduct set forth herein were made in this District.

11. The harm alleged herein emanated from Defendants' improper conduct that occurred in this District, in whole or in part.

## PARTIES

12. Plaintiff Eric Avila is an adult resident of Houston, Texas. Avila used the DraftKings platform from approximately 2018 to August 2024. Through this time, Avila placed around a hundred bets on DraftKings platforms. While the balance in Avila's account varied, in August 2024, when DraftKings deactivated his account, Avila had around $100 in his DraftKings account.

13. Defendant DraftKings, Inc. is a Delaware corporation, with its principal executive offices located at 222 Berkeley St., Boston, MA 02116. DraftKings operates a popular sports betting application in at least 45 states, including Texas. DraftKings is a public company with a market capitalization of around $18 billion.

14. Defendant DK Player Reserve LLC is a limited liability company organized under Delaware law. On information and belief, its principal place of business is 222 Berkeley

St., Boston, MA 02116.  According to the DraftKings Terms of Use, DK Player Reserve LLC holds the money that is in users' accounts.

## FACTUAL ALLEGATIONS

A.  **DraftKings' Gambling Platform Business**

15. DraftKings operates a successful and widely used virtual sports betting platform. The platform offers two main services to users—sportsbook services, and daily fantasy sports services.  Sportsbook services encompass betting on which team or individual will win various athletic competitions.  Daily fantasy sports services focus on users' creation of assembled teams, where team members' statistics will be compiled to compete against the statistics of other user-assembled teams.

16. Users will make wagers of various sizes on these games.  DraftKings makes money by retaining a small cut of these wagers.

17. These is a social element to DraftKings' platform, too.  Users can bet against strangers, but they can also bet against their friends or family.

18. Users of the DraftKings platform keep money in their DraftKings accounts to fund their wagers.  The source of these funds can come from users' own bank accounts, from users' winnings, or from incentive payments made by DraftKings, itself.

19. To use a simple even odds example, a user can load $1,000 into his DraftKings account and wager $200 on the outcome of a basketball game.  If the user wins, his account balance will rise to $1,200, minus the DraftKings fee.  If the user loses, his account balance will fall to $800, also minus the fee.

20. DraftKings may also make incentive payments into the user's account from time to time, which will increase the user's balance.  The amount of these incentive payments varies based on how much the user wagers on the platform.  Generally speaking, the more the user

4

wagers, the higher and more frequent will be DraftKings' incentive payments.

21. Users' account balances are held in segregated accounts, operated by a subsidiary of DraftKings called DK Player Reserve LLC. All revenue made by DK Player Reserve LLC is for the benefit of parent DraftKings.

22. DraftKings imposes boilerplate "Terms of Use" on its users. Under the Terms of Use, users "can request to withdraw funds from their account at any time."

23. The Terms of Use preclude a user from establishing multiple accounts. If a user establishes multiple accounts, DraftKings may terminate the user's account and "revoke" his winnings. To wit:

> You may establish only one account per person to participate in the Services offered on the Website. In the event DraftKings discovers that you have opened more than one account per person, in addition to any other rights that DraftKings may have, DraftKings reserves the right to suspend or terminate any or all of your accounts and terminate, withhold or revoke the awarding of any prizes.

**B.    DraftKings Retains Funds From Closed Accounts**

24. Avila opened a DraftKings account around 2018.

25. From 2018 to August 2024, Avila used his DraftKings account primarily to play daily betting games with his friends. During this time, Avila made around a hundred bets in total.

26. Avila was subject to the Terms of Use quoted above.

27. On or around September 15, 2024, Avila received notice that his account with DraftKings (and DK Player Reserve LLC) was closed.

28. Avila inquired of a DraftKings customer service representative about why his account was closed and asked that his balance be repaid to him. The customer service representative replied as follows: "Your account has been closed due to violating our terms of use. We are unable to specify which rule was violated."

29. The customer service representative added that per the Terms of Use: "DraftKings reserves the right to suspend or terminate any or all of your accounts and terminate, withhold or revoke the awarding of any winnings and prizes."

30. The customer service representative continued: "We cannot disclose specific reasons behind your account's permanent suspension. We do not issue callbacks for permanent suspensions, as your account has been closed permanently; it is not eligible for withdrawals."

31. In this way, based on the language in the Terms of Use quoted above, the DraftKings representative was telling Avila that his account had been closed because DraftKings believed he had established multiple accounts. Due to this erroneous belief by DraftKings, DraftKings was not only closing Avila's account permanently; it was denying him access to the account balance. DraftKings cancelled and closed Avila's account as a pretext for keeping Avila's money.

32. Thus, DraftKings created a catch-22 situation. DraftKings had closed Avila's account, but due to the closing of the account, Avila was prohibited from withdrawing his account balance, which remained in DraftKings' possession. In other words, DraftKings had used its unilateral action in closing Avila's account to steal Avila's money.

33. Avila followed up with multiple other customer service representatives with DraftKings, who all confirmed that stealing users' account balances was its standard policy.

34. Avila was troubled by DraftKings' response for two reasons. First, he had never opened up a second DraftKings account. Second, Avila was confused and angered because DraftKings was creating the catch-22 situation described above and refusing to pay him the balance of his account, which was around $100.

35. This knowing action by DraftKings caused Avila damages in the amount of his lost account balance.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and seeks to represent the following classes (collectively, the "Class"):

6

- **The Nationwide Class**: "All persons whose DraftKings accounts were terminated by DraftKings and who were denied access to their account balances by DraftKings."
- **The Texas Subclass**: "All persons in Texas whose DraftKings accounts were terminated by DraftKings and who were denied access to their account balances by DraftKings."

37. The class period commences on the earliest date within the applicable statutes of limitations applicable to Plaintiff's claims and ends on the date that the Court certifies this suit as a class action.

38. Excluded from the Class are Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as the officers, directors, agents, servants, or employees of Defendants.

39. The Class members are so numerous that joinder is impracticable. Although the Class members' identities and numbers are presently unknown, on information and belief the Class and Sub-Class are each made up of hundreds and potentially thousands of people.

40. Defendants' policy and practice of closing users' accounts and retaining their account balances has subjected and affected all members of the Class. As such, there are many common questions of law and fact among Plaintiff and the Class members, which predominate over questions affecting individual members of the Class. Common questions include, but are not limited to, the legality of Defendants' practice of withholding funds from customers following termination of their accounts.

41. Another common question will be whether Defendants were unjustly enriched by retaining Class members' funds, and if so, the extent to which they were unjustly enriched.

42. Another common question will be whether Defendants' practice of retaining funds from terminated accounts violates Texas' consumer protection laws and laws governing sports gambling.

43. Plaintiff's claims are typical of the claims of the Class members. If brought and

7

prosecuted individually, the claims of the Class members would require proof of the same materials and substantive facts, rely on the same remedial theories, and seek the same relief.

44.  Plaintiff will fairly and adequately protect the interests of the Class, and has retained attorneys experienced in class and complex litigation as counsel.

45.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will permit an orderly and expeditious administration of the claims of the Class, will foster economies of time, effort, and expense, and will insure uniformity of decisions. The prosecution of individual actions would create the risk of (a) inconsistent or varying adjudications; and (b) be grossly impracticable because the cost of vindicating claims individually would likely exceed the value of the claims.

46.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

47.  Due to the relatively small amounts of damage to most, if not all, Class members, a class action is superior to other available methods for the fair and efficient adjudication of the controversy which is subject of this action.

48.  The interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and there is no known difficulty that would be encountered in the management of these Class.

## COUNT ONE

**Breach of Contract**
**(On Behalf of Plaintiff and All Members of the Nationwide Class, Against Defendant DraftKings)**

49.  Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

50. When Plaintiff and members of the Nationwide Class created DraftKings accounts, they entered Terms of Use with DraftKings, all of which were the same or substantially similar. This created enforceable agreements between each Class Member, including Plaintiff, and DraftKings.

51. The Terms of Use provide that users can request to withdraw funds from their account at any time.

52. DraftKings wrongfully retained funds of Class Members, in violation of its Terms of Use.

53. Defendants' misconduct constitutes a breach of contract and has caused damages in the amount of the cumulative unpaid account balances that Plaintiff and Class members had with DraftKings.

## COUNT TWO

### Violation of Texas Deceptive Trade Practices Act
### (On Behalf of Plaintiff and the Texas Subclass,
### Against Each Defendant)

54. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

55. Texas' consumer protection statute, the Texas Deceptive Trade Practices Act ("DTPA") prohibits false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. TEX. BUS. & COMM. CODE § 17.046, et seq.

56. Defendants violated the DTPA by, at a minimum, representing that they were segregating users' account balances, representing that account balances would be available to users in the event the users' accounts were closed and wrongfully retaining balances after closing accounts.

57. Defendants' representations were false and misleading. In reality, Defendants kept users' account balances for their own use and did not refund them to users whose accounts were closed, even when users had not opened another account under their own name.

58. Plaintiff provided notice to Defendants of their violation of the DTPA as required

by the statute.

59. Plaintiff and Texas Class members suffered ascertainable loss as a result of Defendants' unlawful conduct as alleged herein, including the cumulative account balances.

## COUNT THREE

### Fraud
### (On Behalf of Plaintiff and the Nationwide Class, Against Defendant DraftKings)

60. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

61. DraftKings represented in writing to Plaintiff and members of the Nationwide Class that they would be able to access their account balances and monies therein for use on the DraftKings platform and, if they so chose, to withdraw the monies.

62. Plaintiff and members of the Nationwide Class reasonably relied on DraftKings' representations when they set up account with DraftKings and funded them, or otherwise kept a balance in those accounts. Such reasonable reliance on the part of all Class Members may be inferred from the fact that the representation was made in a written contract entered into with all Class Members that contained identical or substantially similar terms.

63. This representation by DraftKings was material. If Plaintiff and members of the Nationwide Class had known that DraftKings would unilaterally and for no reason cancel their accounts and keep the balances, Plaintiff and members of the Nationwide Class would not have kept any money in their DraftKings account, at all, or would not have had DraftKings accounts to begin with.

64. DraftKings' representation turned out to be false. In fact, DraftKings was engaged in a fraudulent scheme to cancel Plaintiff's and Nationwide Class members' accounts and keep the funds for their own pecuniary gain.

65. This fraud has caused damages to Plaintiff and members of the Nationwide Class in the amount of the lost balances of their accounts.

66. DraftKings' action were malicious, such that punitive damages are warranted.

## COUNT FOUR

**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class, Against Each Defendant)**

67. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

68. A benefit was conferred on Defendants in the form of retaining unpaid balances of the accounts of Plaintiff and the Nationwide Class.

69. Defendants had knowledge of this benefit. Indeed, a representative for DraftKings specifically informed Plaintiff via written communication that DraftKings was retaining the benefit of Plaintiff's account balance.

70. Defendants have retained the benefit of the account balances by not paying them out to Plaintiff and to members of the Nationwide Class.

71. As a result of Defendants' misconduct, Plaintiff and the members of the Nationwide Class have suffered damages in the amount of the unpaid account balances.

## COUNT FIVE

**Conversion**
**(On Behalf of Plaintiff and the Nationwide Class, Against Each Defendant)**

72. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

73. The money that was in Plaintiff's DraftKings account was his personal property, which he owned and had the right to possess.

74. The money was personal property because it was specific chattel. That is, it was delivered to Plaintiff and intended to be kept segregated and not used for the general purposes of DraftKings. It was intended to be used for a specific purpose—that is, Plaintiff's gaming on the DraftKings platform. In the alternative, the money was a special deposit.

75. Defendants wrongfully exercised dominion over Plaintiff's personal property by taking it from him and depriving him of its use.

76. Plaintiff suffered injury as a result of Defendants' unlawful taking.

## DAMAGES

77. Plaintiff, individually and on behalf of the Classes, seeks all damages permitted by law, including full refund of class member account balances and interest, incidental and consequential damages, punitive damages, attorney fees, and all other relief allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the putative Classes pray that the Court grant the following relief:

a. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as the representatives of the Classes, and designate Plaintiff's counsel as counsel for the Classes;

b. Declare that Defendants' acts and practices, as described herein, constitute deceptive acts and unconscionable business practices that are unlawful under the Texas DTPA;

c. Direct Defendants to disgorge profits from its misleading and deceptive practices and to pay restitution;

d. Award actual, compensatory damages in an amount to be proven;

e. Award Plaintiff and the Classes' members all monies paid to Defendants as a result of unlawful, deceptive, and unfair business practices;

f. Award exemplary/punitive damages in an amount to be proven;

g. Award Plaintiff and the Classes' counsel attorneys' fees, experts witness fees, pre- and post-judgment interest, and other costs in amounts to be determined by the Court; and

h. Grant any other further legal or equitable relief as this Court deems appropriate.

**PLAINTIFF CLAIMS JURY TRIAL.**

**ERIC AVILA, Plaintiff, by his attorneys:**

*/s/Kenneth D. Quat*
Kenneth D. Quat, BBO #408640
**QUAT LAW OFFICES**
373 Winch Street
Framingham MA 01701
Phone:  508-872-1261
kquat@quatlaw.com

Curtis Waldo
Benjamin Gubernick
**WALDO GUBERNICK LAW ADVOCATES, LLP**
(*pro hac vice* to be filed)
717 Texas Avenue, Ste. 1200
Houston, TX 77002
Phone:  346-394-8056
Curtis@wglawllp.com
Ben@wglawllp.com